You may proceed. Thank you. May it please the Court. Can I reserve two minutes? Certainly. My name is John Schaeffer. I'll be representing the appellants. The Lanham Act remains consistent with the First Amendment because it only regulates speech that is false. Under the Lanham Act, speech is false if it's likely to mislead or likely to cause confusion. In this case, which is a nominative fair use case, which everyone agrees is a nominative fair use case, as the defendant in the underlying action, I met my burden by proving that my speech was truthful, by proving that my use of trade dress and my use of a mark were used to identify life skin. So I met the threshold of truth. Now, a problem arises because under the nominative fair use standard as it exists today, the plaintiff actually has a lower threshold to cross to prove a Lanham Act violation than they would under the traditional sleep-craft factor test. Under the traditional sleep-craft factor test, you're going to balance eight factors against each other, and you're going to weigh and balance all of them and look at all of them. They may win some of the others and reach a resolution. Under the nominative fair use standard as it exists in the Ninth Circuit today, the plaintiff prevails so long as they prove one of the three elements out there. And the problem that you have with those three elements is those three elements aren't tied to the fundamental purpose of the Lanham Act. They're not tied to this idea of falsity. They're not tied to this idea of misleading. There's no dispute as to the first element, as to whether there was a need for us to refer to their mark. I'd like to jump first to the third element, the third element being, do we do anything to suggest sponsorship? And it's interesting when you look at the lower court's opinion here, because the lower court effectively seems to say we didn't meet our burden in proving the absence of sponsorship. But it's not our burden. As the panel knows, this is not the way the district court said it. Or are you just paraphrasing it? I will read to you what the district court said, because I have the order right here, which is. Effectively did not carry your burden. Eighteen. Accordingly, defendant's conduct does not meet the third element of the nominative fair use standard. There's nothing about you having the burden there. See, this is the problem we get into when lawyers paraphrase and they characterize. And then you ask them a question and the magic word, burden, evaporates. Point taken, but let's step back a little bit from that. Because in this case, we had a disclaimer. Dr. Eric, I can't pronounce his last name's disclaimer. No, we had a disclaimer. We had Dr. Joachim Stoller. Yeah, like Dr. Joachim. Dr. Joachim Stoller. Yes, yes, Your Honor. They had the burden to prove our disclaimer was ineffective. Dr. Joachim Stoller admits in his declaration that he never even saw our disclaimer as it appeared on the packaging. So how can he offer any opinion on the validity, enforceability, or usefulness of a disclaimer if he never saw it? Well, this is sort of an unusual case in the sense that OneTouch was marketed on the basis of uniform calibration. In other words, a problem with the meters is you have to recalibrate it. And so this product was sold saying, look, you don't have to recalibrate. We figured out our test strips, and you don't have to recalibrate each time. And with your product, you did have to recalibrate. And that's sort of in this particular niche, it seems to be an area of some product confusion. To differ a little bit, LifeScan's product is unusual because of all the diabetic systems out there. It's the only one that has a calibration issue. When you look at their own product manual and their own vials, their vials tell you you need to check the calibration each time. They have a calibration requirement. It's only recently in the past couple of years that they've been able to narrow their structure to have a single calibration. Right. But they do. But if you look at our product, yes, they do. If you look at our product, we have a single calibration. We don't vary our calibrations. But it's different. We just received FDA approval using one or two calibrations. The issue of the safety and efficacy of this product and the likelihood of consumers being harmed by our product is not before this Court. That's an issue before the FDA. The FDA decided it. The FDA approved it. This is an approved product by the FDA. All right. Well, maybe I don't understand how your product works. You've got this, you've got a machine, right? And your product is a strip? Yes. We make the strip. You make the strip that goes into the machine and then that gives you the information you need. Now, how does calibration work with respect to this machine and your strip? Okay. To step back to answer your specific question, you have a meter. A meter is going to give you your diabetic reading. It's going to give you your number. The strip is what you put the blood on. Right. You put your drop of blood on there. You put it into the machine. It gives you a reading. Exactly. Historically, with respect to these devices, you would have variability in manufacturing. So that variability in manufacturing would give you different electrical results. So you would need to have that variable set of strips made at that time calibrated to the device. So the device would know these strips have this calibration. Right. And so you have, on the, it says here you need to calibrate your meter to whatever number on the test strips. But then these test strips are saying, you don't have to do that anymore because if you buy our product, it's already calibrated to the same, or it already has the same calibration. And consistent with our FDA approval, we have to sell our strips with a particular calibration. We have to sell our strips using one or two calibrations. We can go back to the FDA, and the reason for that, Your Honor, was that in the testing, we couldn't get the underlying programs that would use their calibration. So we were only able to say, we tested, we designed strips, and in our clinical testing, we tested with a particular calibration. So the FDA said, you can, you've only proved safety and efficacy with respect to that calibration, so that's all you can sell. Right. I grant you all that. I'm talking about the issue of consumer confusion, because the consumer buys this particular test strip, and they say, okay, it was marketed as one that I didn't need to recalibrate. Now, the logo's on, the picture's on there, they buy it off the sheet, and they think that they're buying a product, regardless of the disclaimer at the back that says, you don't need to calibrate. And then they get false results. And that's the error in your analysis, with all due respect, which is that the LifeScan product in its manual, and as you buy it today, says you must check calibration with each set or each new vial that you buy. What they've been able to do recently is they always sell with the same calibration. Right. But now they always sell with 16, but it still specifically says you have to. Well, of course it does in the manual. I mean, you would be negligent. And if you didn't say check your calibration, but I mean, in fact, it's marketed as a single calibrated strip. I'm not aware, and I don't think there's anything in the record that indicates it's marketed as a single calibrated strip. That is not part of this record. There's no advertising that it's a single calibrated strip. This product is seen as a lesser alternative to the competition, because you still have to examine calibration. The competitive systems work the calibration into the strip. So the user, the diabetic patient, never needs to worry about it. This is one of the last systems that still has that calibration issue. But, Your Honors, what's important here is we're on a Lanham Act case. We're on a Lanham Act case involving consumer confusion. We're on a Lanham Act case where we're discussing whether or not consumers are going to believe that the GenStrip is somehow affiliated with LifeScan. That's the only confusion we're looking at. That's the only area that the Lanham Act can address. The fact that a consumer may be confused on how to calibrate their test strip is not an issue addressed by the Lanham Act. It's not an issue. Well, let's go to your issue, then. I look at the packaging, I look at this thing, and there's the meter. Why isn't it confusing? Why isn't it confusing? And that gets to the point we're talking about. It is not confusing because we are using, we are showing our product in use with the meter. With their product. With their, that's what it's designed for. Our strips only work with their meter. They don't work with any other meter. There's the example of the case where the other non-benefarious case, name's escaping me, involving Carwax. And they showed a Porsche with their Carwax. And I said, your Carwax works with any car. You didn't need to show a Porsche. In our instance, our strips only work with the LifeScan meter. LifeScan concedes that we are allowed, we are allowed to say on our packaging that it works with the LifeScan meter. In this curious case, four days after we file our opening brief, the trial court amended his order and said, yeah, you know, you're right. In your package inserts, you can actually show your strip working with their meter. Since the FDA has approved that packaging, you're allowed to do that. The issue here, your Honor, is not an, it should be an issue of confusion. But that is not the threshold that was decided below. The threshold decided by the court below was a set threshold of necessary. Is it necessary to show the image? And what I would like to proffer to this court is the idea of necessity as it's existed today cast too broad of a net. Because you are capturing uses of images that aren't necessarily misleading. There's nothing about the showing of an image in and of itself that creates confusion. That just doesn't exist. You can go back to the Society Contour case, which was the Christian Dior case. I sell knockoff Christian Dior dresses. I'm allowed to show the dresses because. But then why have a disclaimer? We have a disclaimer. At belt and suspenders in your argument? Belts and suspenders in our instance. And again, it's LifeScan's burden to prove the disclaimer's ineffectual. They have no evidence. All the evidence they've cited are traditional Lanhamac cases. In the traditional Lanhamac case, my disclaimer and the effectiveness of my disclaimer doesn't come into existence until, until there has been a finding of confusion. Here we have a three-part test. And what I'm proffering is that three-part test doesn't address the issue of confusion. The first is, do you need to use it? No dispute there. The issue, the next issue is, are you using more than necessary? And the third issue is, does it affect endorsement? Is it a, is there a factor in cases like this involving the sophistication of the user? Yes. The sophistication of the user, well, that's not been adopted by this Course because that's a sleek craft factor. Right. And it's not been brought into here. But under the Court's analysis that exists today, greater use than necessary. Let's say my box. I made my box simply look like a LifeScan meter. The box itself looked like a LifeScan meter. But then on the box, I put in LED lights, we are in no way affiliated with LifeScan. Under the Court's standard today, I would lose, because even though no one in their right mind would ever think I was affiliated with LifeScan because I got blinking lights on it saying I'm not, the standard here is as long as, as long as the plaintiff proves one of the three, they win. And because my box looks like a LifeScan meter and there's no reason for it, then I would lose. And the standard that you're going to hear my colleague come up and argue is the Tabari standard, which talks, which effectively follows what the lower court said or is the most recent Ninth Circuit statement on this, which talks about this notion of the visual trappings. I mean, I would like to ask you before your time is up about the order that's in place right now that just tracks the language of the law. I think you were arguing in your appeal that the district court was not within its authority to amend the order after the appeal had been filed. But I'm not sure that that is correct. But I do have some questions on the order and whether it should be more specific. What is it that you would like the order to state? Well, it's not necessarily what I want the order to state, but under Rule 65, what is it, D1B&D, it needs to be specific. I understand that. So what specificity would you argue needs to be in place? The specificity that would need to be in place is have a clear articulated ability of how we can use the image. And do you have a suggestion for that? I don't have a suggestion for that right now. Okay. Because I think that would be an issue for the lower court to decide, and I would argue to the lower court as to what that should be. But you can't have an injunction that says you must conform to law. That fails under every definition of specificity. But going back to my last point, which is under Jabari and the use of images, I think that you could argue and would make a compelling standard is if the use of the image is just simply gratuitous. It adds nothing to the information about the product. If we agree with you and rule in your favor, what happens next? The injunctions reverse. The case goes back down. And? And we litigate the matter. And is this one of those cases where the decision on the preliminary injunction pretty much decides the case, or in your view, no? It does not necessarily decide the case. In fact, it would not necessarily decide the case. We – our product is out there. We're on an ongoing battle now with LifeScan, and LifeScan is shooting every bullet it can at us to prevent us from competing with them. The case in the Federal Circuit is still alive? The Federal Circuit case as to the one patent is gone because the court found exhaustion. And it's going to go back down from some administrative proceedings, but by finding that they had exhausted their patent rights in the meter by giving it away or by selling it at discount, that effectively means they can't assert method claims associated with that. But they have two other patents they've sued on, and the case is going forward on those two. Thank you, counsel. Thank you. May I please the Court? My name is Catherine Williams, and I represent LifeScan and Johnson & Johnson. Shasta's counsel has effectively asked you to reconsider the Tabari and New Kids nominative fair use test, but there's no reason to do so in this case. All of his arguments focus on the second element of the test, but in this case, the district court correctly found that LifeScan met its burden of showing it's likely to succeed with respect to both the second and third elements of the test. In other words, the district court found that LifeScan offered evidence showing it was likely to succeed, that the GenStrip package actually conveys a false message of sponsorship or endorsement to consumers. That decision wasn't an abuse of discretion. It was based on LifeScan's unrebutted expert testimony, and the only unrebutted expert testimony by whom and to what effect? Unrebutted expert testimony of Dr. Eric Yocumsthaler to the effect that the visual elements of the package are likely to mislead consumers into believing that LifeScan is affiliated with or endorses or sponsors the GenStrip product. Because nobody pays any attention to the disclaimer. That's correct, Your Honor. The district court found that the disclaimer is likely to be ineffective in this case, and that, again, was well within the district court's discretion. In cases where this court has recognized that disclaimers may be effective, they have, this court has expressly identified them as prominent large font disclaimers. So, for instance, in the Tabari case, there was a prominent large font disclaimer at the top of the website that the court said was likely to be effective. In contrast, in cases where there's a classic fine print disclaimer, as in this case, on a different side of the package than the, the side of the package where LifeScan's trade dress and trademarks are used, courts have consistently found that the disclaimers are ineffective. It's hard to tell from the excerpt. Can you read it with the naked eye? Can you read the disclaimer with the naked eye? Yes. On the package, I would say you can read it with the naked eye. Yes. The via label, I believe the court found it was illegible. It's very small. You know, it strikes me that these are reasonably sophisticated people who are using these kinds of things. Does that make any difference as to whether or not they're reading what's on the box? I don't know that the record reflects that these are reasonably sophisticated consumers. Kind of assume that, can't you? I mean, these are people who have serious medical problems and they're taking care of their health. You're going to live or die if you don't do this right. So aren't these the kind of people who are going to pay attention to things that are written on the box? Whether they pay attention to the fine print disclaimer that has nothing to do with information relating to how to use the product or, you know, the expiration date, I don't know. There's certainly no evidence in the record to suggest that. Is it true that your expert never looked at the disclaimer as it appears on the product? Dr. Jochenstaller, that is true. He did not have the actual box available. That kind of strikes me as very strange. And how can you tell the effect of something if you're not looking at what the something is? Well, they weren't on the market. Your Honor, we didn't have the box. But still? I don't think that the Shasta has ever questioned that his characterization of the disclaimer was accurate. And certainly the district court had the box in front of it when it was evaluating whether it was likely to be effective. And it found that based on the fact that it is in small print and it is not in close proximity to LifeScan's trademark and trade dress, then it's unlikely to be effective. I don't know what small print is. If you can read it with the naked eye, is that small print? I mean, I know what small print is. I have to get a magnifying glass to see what it says. But here it's you can read it just using your regular eyesight. Well, that might depend on the consumer, Your Honor. I don't think there's any question that it's a very small print. I mean, the top of the box is quite small. I think it's described in the district court's opinion. It's just two and a half by one and a half inches. And the disclaimer is quite lengthy and only, you know, appears on half of the box top. Setting the disclaimer issue aside, you know, LifeScan showed that the appellants meet neither the second or third element of the nominative fair use test. The fact that they use the trademarks and trade dress when there's no reason to do so is a separate reason for the district court to grant the injunction in this case. And that wasn't an abuse of discretion either. In ordinary commercial use cases, this court has repeatedly drawn a distinction between using words to describe a product and using the visual trappings of the brand. LifeScan has never challenged the appellant's ability to use the trademark product names of LifeScan's product. It's just challenging the use of visual trappings of the brand. If I understand this correctly, Shasta's trying to enter this market, something that no one's done apparently, and that is to use their strips on someone else's meter. Is that, am I correct? That's correct. And so they run into some difficulty when they do this because if they're going to advertise, how do they do that? And I think this is what this case is about. How exactly do they do that without confusing the consumers or in a way that suggests that your clients endorsed them? And isn't that what this case is all about? That is what this case is about. And the fair nominative use test was applied by the district court. And is that the correct test? That is. Everyone agreed it's the correct test. All right. What then should Shasta do or what can they do to enter this market and not violate the fair nominative use test? They can put on their boxes, which I understand is what they're doing now, for use with OneTouch Ultra, Ultra 2, and Ultra Mini meters. Without the picture. Without the picture. And those words were on the box that had the picture as well. Well, they can do that, but it's not particularly effective. And any teacher will tell you that you've got to show and tell at the same time. Well, the evidence on this issue is that it was undisputed that LifeScan doesn't have a picture of a meter on the front of its box. It uses words to explain which meters its strips are compatible with. And the. So are they restricted then just to sell a box as you do with just the strip on the front? Well, they can use other visual elements as long as they don't use LifeScan's trade dress. The wording of the injunction gets pretty crazy in my view. I mean, it just says don't violate the law. You think that's specific enough so that it can be enforced? The wording of the injunction, I think, actually gives pretty clear markers about what they can't do. First of all, it says they can't use LifeScan's trademarks and trade dress on the package. Then it says they can't use it in their advertising except to demonstrate the correct manner of use. But then they say that they can do what? Well, it's there's actually no section that says they can. They say except that they can use it to demonstrate the correct manner of use as long as they don't do anything else that suggests sponsorship or endorsement. And then it gives some specific guidelines for what kind of disclaimer they would need to include. And that was an appropriate, you know, exercise of the Court's discretion, the Court's broad discretion in shaping the injunction in light of the record before it and the concrete examples that appellants had put in front of the Court as to what they wanted to be able to do. Going to one of the questions, appellants hadn't, had taken a position in the district court that they should basically have unfettered use of LifeScan's trademarks and trade dress. It wasn't until after the original decision came out that they came back and said, no, Your Honor, look, there's this problem. We've got this package insert. We think the injunction covers it. The package insert provides instructions for use. LifeScan doesn't have any problem with them illustrating the package insert to provide correct instructions of use to consumers. So it said it didn't have any objection to modifying the injunction to permit that use. So the appellants know that they can use the type of illustrations that are in the package insert to tell consumers how to use the GenStrip. And that's what the injunction allows. So you think the current injunction or the current order right now is specific enough? I do, Your Honor. They haven't identified any way in which they'd like to use images, any specific way that isn't permitted by the injunction. This Court's law is also clear in the goto.com case cited in our brief that an injunction doesn't have to spell out all permissible uses. And the mere subjective assertion of the appellants that they don't know how to comply isn't going to be enough to overturn the injunction. So on the calibration issue, your opponent says, look, that's a safety question. That's not a trade dress issue. Do you agree with that? You've raised the calibration question in your briefing. So do you think it has anything to do with trade dress or likelihood of confusion? Yes. We argue that it has to do with the irreparable harm. That's where we relied on the calibration code issue. And we put in. So in your view, it goes to harm, not on likelihood of confusion. That's right, Your Honor. Harm to your client or harm to the public? Harm to my client. In what way? The district court, I think, correctly found that LifeScan, as you, I think, observed, has taken steps to make its meters easier to use by distributing and selling meters that are preset to a single calibration code and selling test strips that are preset to a single calibration code. So consumers at this point are used to not having to recalibrate their meters. Gen strip is sold with three different calibration codes, 4, 10, and 13, as compared to LifeScan's 25. So now consumers, for the first time in years, have to reset the meter when they use a gen strip. And the district court found that one of two things is likely to happen. Either they're not going to recalibrate the meter because they don't understand they have to do it, in which case they'll get an inaccurate reading and may be harmed, or they will recalibrate the meter and it will be less convenient and harder to use. And in either case, consumer dissatisfaction, if they think LifeScan sponsors or is affiliated with this product, will harm LifeScan's reputation for accuracy and ease of use. I guess the other thing you raised was the question of technical assistance.  We did put in evidence that LifeScan won't be able to provide consumers with the customer support they've come to expect from LifeScan when consumers are using the gen strip. I found that, it struck me that is a bit speculative. What evidence did you have in the record about the fact that your technical support would suffer? We put in, that was addressed in the lead declaration in the record, and I think he simply made the point that LifeScan can't support another company's product, so LifeScan won't be able to provide customer support for the use of the gen strip with the LifeScan meter. And did that include information that LifeScan does provide customer support, that there's all kinds of inquiries, calls, whatever you want to, however you want to call them? He did put in evidence that LifeScan provides customer support, and then it costs LifeScan $15 per call to support its customers. If there are no further questions. No further? Thank you, counsel. We'll give you two minutes for rebuttal. Just a second. Hold on, hold on, hold on. It's not hard to put the, there you go. Thank you. At the first request, we did provide a copy of the box. You should have it. It has a disclaimer. It's on the top. In order to open the box, you've got to see the disclaimer. So if you're interested, your clerk should have it, because we sent it to them. Secondly, they had all of our promotional information and box information at the time. They had Yachum Stuller provide a declaration. They could have shown it to him. They decided not to. Two, Yachum Stuller, as we've contended in our brief, his opinion is legally insufficient, because when you read his opinion, he's offering a free-rider opinion. He's saying we are free-riding on their goodwill. According to Smith v. Chanel and Sykes v. Calvin, free-riding does not equate to confusion. And the last point, Your Honor, is very simple. If a consumer walks into the store, they see our strips for, like, $20. They see their strips for $100. Is any consumer going to believe that LifeScan is selling their own strips for $20? Where's the evidence that anyone's going to believe LifeScan is sponsoring this product? It's just not there. And now the real final point is Your Honor, on a daily basis, sees comparative advertising. I saw there's one out right now for Advil v. I think it's Bayer. They show both products. Under the lower court's ruling, the showing of an image is never allowed for comparative advertising. That's just not the law. I think that's a little broad reading of the lower court's ruling, though. The lower court – that is not a broad reading of the lower court's ruling. He says we need to show that why words are not enough. And if for any comparative advertising, you can simply say we're better than Bayer. You don't need to show it. But in comparative advertising, you're showing both products at the same time. You're not showing two products on the cover. That's the difference. But, no, this is comparative advertising. We are comparing our strips to their strips and saying they're compatible. But also we're going to – If you're using strip by strip against each other, that would be one thing. But it's part of the process. It's part of the element. But we're doing it. We're taking it a step further. We're not just showing comparatively. We are actually showing our product working with that product. And no court in any jurisdiction in the United States has ever held showing compatibility, an image of compatibility, would violate nominal fair use. Thank you. Roberts. Thank you. Thank you all for your arguments. The case just heard will be submitted for decision.
judges: Trott, Thomas, Murguia